Filed 12/22/25  In re A.W. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re A.W., a Person Coming Under the Juvenile Court Law. | C103850 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | (Super. Ct. No. STKJDDP20220000481) |
| Plaintiff and Respondent, | |
| v. | |
| A.W., | |
| Defendant and Appellant. | |

Appellant mother appeals the juvenile court's disposition order removing her daughter A.W. following a Welfare and Institutions Code section 387 supplemental petition.[1]  She complains substantial evidence does not support the court's removal order

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

and that there were reasonable means to protect A.W. without her removal. We will affirm.

## I. BACKGROUND

This description is limited given mother's complaints on appeal.

*A.     The Initial Case*

The initial case began after mother tested positive for cocaine and marijuana at A.J.'s birth in December 2022. Shortly thereafter, the San Joaquin County Human Services Agency (the Agency) filed the original section 300 petition alleging A.W., as well as Al.W. and A.J.,[2] were at risk due to mother's substance abuse, lack of safe/stable housing, and mother's failure to meet the children's basic health, safety, and medical needs. Included among the allegations was that A.W. tested positive for cocaine at birth in 2018, and mother was referred for but did not complete substance abuse treatment. Mother started using cocaine at age 17 and had last used cocaine the week before. A.W. and Al.W were four and five years old, while A.J. was a newborn.

The juvenile court detained all three children on December 12, 2022, and ordered supervised visitation. In January 2023, the petition was amended to remove certain allegations concerning A.W.'s behaviors. Thereafter, mother submitted on the petition and was referred to drug court. The juvenile court officially took jurisdiction on January 31, 2023, finding the allegations of the petition true

According to the Agency's disposition report, mother acknowledged A.W. had challenging behaviors and was open to learning new ways to address them. A.W. was born on substances, was not developing within normal limits, and had a severe speech delay. She was referred to the school district for a speech evaluation and had an

---

[2] We will refer to all three children collectively as "the children," whereas Al.W. and A.J. will be referred to as "the siblings." A.W. and Al.W. will be collectively referred to as "the girls."

2

appointment for an individualized education plan. A.W. was also referred to Valley Mountain Regional Center for an assessment given her struggles regulating her emotions, poor impulse control, and difficulties communicating. Finally, A.W. was receiving mental health services from Victor Community Support Services following a Pathway to Well-being referral. Mother regularly visited but had difficulty managing A.W. and Al.W.'s behaviors, including their running in and out of the visitation room, disrespectful speech, hitting, and refusal to follow instructions. Mother was twice directed to report to residential drug treatment but did not report. Her participation in other services was limited and inconsistent.

In February 2023, the juvenile court adjudged the children dependents, removed them from mother, and ordered reunification services.

According to the Agency's six-month review report, mother entered residential treatment on May 30, 2023, and was actively participating in the program, including testing negative. She had completed her parenting course and was engaged in individual counseling. Mother had supervised visits two times weekly and struggled to manage A.W. and Al.W.'s behaviors. Her visits were suspended following a sustained allegation that mother swatted A.W. during a visit, causing A.W.'s knuckle to bleed. Mother did not cooperate in the investigation but admitted to a third party that she swatted A.W. to discipline her for not listening. A.W.'s negative behaviors at her placement lessened with WRAP services, which occurred weekly. At the six month review hearing, the juvenile court extended mother's reunification services. It appears concerns regarding mother's visitation had been previously addressed, and the court gave the Agency discretion to allow mother unsupervised visits.

The Agency's 12-month review report reflected that mother had maintained her sobriety, obtained employment, and was living with her brother. Mother completed the Futures Redefined counseling program, as well as outpatient drug treatment. She visited with the minors at home twice weekly for a total of 10 hours. Mother continued to

3

struggle with the children's behaviors during visits but wanted to begin overnight visits. Given mother's progress, the Agency recommended an additional six months of reunification services. A.W. still had substantial needs requiring multifaceted assistance. For example, A.W. had substantial tooth decay, but refused to cooperate with the dentist requiring treatment under anesthesia that had to be aborted due to complications. A.W. had completed her assessment with the Valley Mountain Regional Center and would receive services from them to address issues associated with her previous drug exposure. However, her services with Victor Community Support Services were scheduled to end once A.W. was fully set up with Valley Mountain Regional Center. A.W. was attending kindergarten with an individualized education plan designed to enhance her skills and attended a special day class. Areas targeted for skill development were: "social, cognitive, communication, daily living, motor functioning, and vocational training." At the 12-month review hearing, the juvenile court extended mother's reunification services, set the matter for a three-month interim review, and approved overnight visits.

Mother's visitation status was changed to supervised in March 2024. It appears this was the result of a February 2024 incident wherein Al.W. returned from an unsupervised overnight visit with red marks on her back, butt, and left leg. Al.W. reported she got in trouble with mother's brother for not taking her medication and because she jumped and/or flipped on the couch. Mother's brother denied physically disciplining Al.W.

The Agency's 18-month review report recommended terminating mother's reunification services. Mother had completed her services, including graduating from drug court in January 2024. However, she continued to struggle during supervised visits, including failing to set and consistently enforce rules, as well as allowing the children to fight with each other and physically push mother for not getting their way. Mother required coaching to keep her children close and failed to appreciate the aggression being caused by allowing the children to use her phone. Mother's inconsistency with rules and

4

boundaries prevented her from effectively parenting the children, despite her completion of a parent education class. Mother further allowed others to physically discipline her children. A.W. continued to receive WRAP services, which were lessening her difficult behaviors. A.W.'s educational and counseling services had not changed.

At the contested hearing on July 8, 2024, the juvenile court approved a 30-day visit with mother in the home of a maternal aunt who had volunteered to have mother and the children stay with her. This visit would begin once the girls were over an undefined illness. If the visit went well, the children could be returned to mother with family maintenance services, and if not, the Agency's recommendation was to terminate reunification services.

In the interim, and prior to their 30-day visit with mother, the foster mother reported that A.W. and Al.W. had been touching each other sexually. Al.W. reported that A.W. would lick her private parts and the foster mother had seen Al.W. masturbating. According to Al.W., A.J.'s father (now deceased) had licked both Al.W. and A.W.'s private parts when the family was living in a hotel. Al.W. also saw her mother engaging in sexual behavior with A.J.'s father. At their placement, the girls previously shared a bedroom that had an alarm and baby gate to keep A.W. from getting into things, but the Agency created a safety plan that required the girls to sleep separately from each other and never be left unsupervised together. This safety plan would continue in mother's care.

In August 2024, the children were returned to mother with family maintenance services. This was approximately 20 months after the children's detention in December 2022.

B.     *The First Section 387 Petition*

In October 2024, the Agency filed its first supplemental petition (§ 387) alleging the children were at risk because of mother's failure to properly supervise them. Specifically, mother completed parent education in May 2023 and in July 2024 maternal

5

aunt J.G. offered to help mother set boundaries and supervise her children. However, in September 2024, A.J. ran into the street, mother followed, and they both were hit by a car. Both went to the hospital and were released approximately five hours later. Mother explained she had been getting the three children out of the car when A.J. ran into the street. Al.W. contradicted this, telling the Agency social worker that she and A.W. were in the house when the accident occurred. The house's ring camera was not activated, and thus, did not capture the incident. Regardless, mother's inability to supervise A.J. on this occasion demonstrated her inability to adequately supervise all the children. The associated manual detention report reflected the Agency's concern that J.G. was not truthful about the accident and that A.W. required a higher level of care than her siblings and should have 24-hour supervision. Ultimately, the section 387 petition was dismissed with an admonishment to carefully supervise the children and plan ahead to avoid another accident. Otherwise, the juvenile court indicated it would infer mother had insufficiently supervised her children.

C.      *The Second Section 387 Petition*

The Agency filed a second supplemental petition (§ 387) on February 18, 2025, alleging the August 2024 disposition placing the children with mother had not been effective in the protection and rehabilitation of the children. In support of this, the petition alleged that in July 2024 the Agency substantiated allegations that A.W. and Al.W. had been touching each other sexually and that the former foster parents had been inadequately supervising them. Also in July 2024, mother was made aware of the substantiated allegations and signed a safety plan including that A.W. and Al.W. would never be together unsupervised due to the identified threat of " 'sexualized behaviors between siblings.' "

In September 2024, the Agency referred mother, A.W., and Al.W. for family counseling and sexual abuse counseling to address sexualized behaviors between the minors, educate mother on supervising sexually abused children, and provide further

6

information on supervising the minors. In October, the social worker reviewed the safety plan with mother, who stated she does not leave the children alone together. A few weeks later, the counseling clinician reported that mother would not be participating in the counseling, had scheduled an appointment for the girls only, and had then been a no-call, no-show for that appointment. Mother had not rescheduled the appointment since missing it.

In September 2024, A.J. was struck by a car leading to a supplemental petition that was ultimately dismissed, and the Agency expressed concern about mother's abilities to "adequately and appropriately provide supervision over the minors in her care."

The Agency reviewed the safety plan with mother in November 2024 and again in December 2024 after the family moved to a new address. Mother stated that the family slept in the same room with Al.W. on a toddler bed, and mother, A.W., and A.J. sharing a couch.

At an unannounced home visit on January 15, 2025, mother told the Agency that all the children slept in the same room with A.J. sleeping on a toddler bed and A.W. and Al.W. sharing the couch. Mother slept in a room down the hall. The Agency then interviewed A.W. and Al.W. separately at school. They both indicated they slept together in the same room, while A.J., mother, and an unknown male slept in a different room. The Agency visited the family the next day, and the girls maintained that they slept together in the same room. Mother, however, stated all her children slept in the same room with her and that she understood the safety plan.

Thereafter, the Agency received a hotline referral on January 22, 2025, reporting that A.W. had been "demonstrating sexual behaviors towards" Al.W. and that mother was aware of the behavior. Further, A.W. disclosed that mother "whoops her 'really bad,' " and mother had told the children not to speak with the social worker about discipline in the home. At the beginning of February, Al.W.'s therapist reported Al.W.'s disclosure

7

that A.W. was touching her inappropriately at night, that Al.W. would tell mother who would separate A.W., but that A.W. would then return and touch her again.

In February 2025, the Agency determined allegations of general neglect and physical abuse by mother were inconclusive due to mother's failure to cooperate with the investigation. The Agency was concerned about mother's inability to supervise the minors, as shown by her struggle throughout the dependency to "adequately and appropriately" parent all three children.

The Agency recommended placing the children with a foster caretaker, and the Agency's manual detention report recommended placing A.W. separately from her siblings.

D.     *The Agency's Jurisdiction/Disposition Report on the Supplemental Petition and Hearings on the Supplemental Petition*

On February 19, 2025, the juvenile court detained the children, with A.W. to be placed separately from her siblings. Mother would receive supervised visitation.

The Agency's March 2025 jurisdiction/disposition report on the supplemental petition recommended removing the children and terminating mother's reunification services. Despite completing numerous reunification services, mother continued her struggles with consistency and supervision, thus endangering the children. Since the children were returned to her, mother failed to consistently take them to school and appointments with service providers. She also refused to engage in counseling targeted towards addressing A.W.'s sexualized behaviors, and mother's repeated, last minute cancellations were endangering the continuance of A.W.'s WRAP services. Mother further allowed A.W. and Al.W. to sleep in the same room unsupervised despite a safety plan to the contrary, resulting in A.W. engaging in inappropriate behavior with her sister. Mother told the children not to speak with the Agency, hampering the Agency's investigation into referrals for mother's general neglect and physical abuse.

8

The juvenile court held the contested jurisdiction and disposition hearing following the section 387 petition in May 2025. At this hearing, the juvenile court received into evidence the Agency's March 2025 jurisdiction/disposition report on the supplemental petition and a delivered service log from October 1, 2024, to April 29, 2025. The court also received testimony from the Agency social worker L.D. and mother.

Mother testified to completing various services at the Agency's direction resulting in the return of her children. After that return, mother denied that she failed to follow the safety plan to supervise her children at all times and professed that she did not leave A.W. and Al.W. unsupervised. Al.W. had her own room and A.W. slept with mother. A.W. and Al.W. were never alone together. Mother asked the juvenile court to return Al.W. and A.J. to her or alternatively return just A.W. until she could demonstrate her ability to care for all three children at the same time. On cross examination, mother denied telling the Agency social worker that the girls slept together in the same room or that she slept in a different room, even though this information had been verified by an interview with the girls.

The children's counsel called the Agency social worker L.D. who testified that the "[s]afety plan was that mom was to supervise [A.W.] around any other children and she was not to leave [A.W.] and [Al.W.] around alone unsupervised." This was needed "[a]ny time, any hour especially during sleep hours." Mother told the social worker she would comply with this by sleeping with A.W. The Agency also tried to educate mother by providing a referral to a counselor who specialized in sexually abused children, but even though 10 sessions had been authorized, none were completed. Mother made two appointments for which she no-call no-showed and "declined to participate in the family therapy." A.W.'s sexualized behaviors had been noted during the first removal, and A.W. received some treatment for those behaviors through her WRAP services. However, given A.W.'s developmental disabilities, she struggled to not reengage in her

9

inappropriate behaviors.  Two hotline referrals concerning A.W. continuing to sexually touch Al.W. were made in January 2025, at least one of which was made by Al.W.'s clinician.  Nonetheless, the girls denied the touching had occurred.

Thereafter, the Agency argued mother was aware of the safety plan but failed to follow it as shown by the girls' statements and hotline reports by Al.W.'s clinician.  Further, mother refused to engage in the sexual abuse counseling and despite her 28 months of services, she continued to demonstrate her inability to prioritize her children's safety and wellbeing, as shown by other unspecified issues culminating in the court hearing that day.  Accordingly, the Agency asked the juvenile court to find the section 387 petition true.  The children's counsel agreed the section 387 petition should be sustained, stating that mother had been offered services targeted to address A.W.'s behaviors, mother failed to take advantage of those services, and that Al.W. had continued to complain to her clinician about inappropriate touching.  Mother's counsel disagreed, arguing mother had complied with the safety plan and if A.W. was separated from her siblings, there would be no need to remove her from mother's care or vice versa.

The juvenile court ruled, acknowledging mother had been in family maintenance services when the referral for specialized counseling was first made.  However, mother failed to follow through despite having one young child sexually acting out against another, suggesting mother was in denial about the situation and had not followed the safety plan.  The court sustained the allegations of the section 387 petition and adopted the proposed findings and orders on disposition, removing the children from mother and terminating her reunification services.  Mother timely appealed the decision as to A.W.

## II.  DISCUSSION

" 'When a section 387 petition seeks to remove a minor from parental custody, the court applies the procedures and protections of section 361.' " (*In re D.D.* (2019) 32 Cal.App.5th 985, 996.)  Under section 361, subdivision (c)(1), a minor may only be removed from the home if the Agency establishes by clear and convincing evidence that

(1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home," and (2) "there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." Jurisdictional findings other than severe physical abuse of a child under the age of five do not result in a presumption in favor of removal. (*In re Zoe H*. (2024) 104 Cal.App.5th 58, 72.) Instead, a juvenile court considers the current risk to the child given the parent's past conduct and present circumstances. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) It is not necessary to show prior harm to the child; rather, the statute focuses on averting that harm. (*In re D.D., supra*, at p. 996.)

We review the juvenile court's findings for substantial evidence keeping in mind the clear and convincing evidence standard. (*In re Zoe H., supra*, 104 Cal.App.5th at p. 71.) This has been described as " 'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*In re M.V.* (2022) 78 Cal.App.5th 944, 960.) In conducting this review, we consider "the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.) " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Mother bears the burden of establishing a lack of substantial evidence supporting the juvenile court's order. (*In re D.D., supra*, 32 Cal.App.5th at p. 990.)

Here, the juvenile court found by clear and convincing evidence that removal of the children from mother was required because both:

"a. There is a substantial danger to the physical health, safety, protection, physical and emotional well-being of the children, or would be if the children were returned home,

11

and there are no reasonable means by which the child's physical health, safety, protection, physical and emotional well-being can be protected without removing the children from their mother's physical custody's [*sic*][; and]

"b. The children and sibling of the children have been sexually abused or is [*sic*] at substantial risk of being sexually abused by a member of their household and there are no reasonable means by which the children can be protected from further sexual abuse without removing the children from their mother's physical custody's [*sic*]." In support of these findings, the juvenile court found true 15 sets of factual statements mirroring those set forth in the amended petition.

Mother does not challenge the substantiality of evidence supporting these 15 factual findings. Rather, mother posits that the removal of A.W.'s siblings eliminated the risk that A.W. would be sexually inappropriate with them such that her removal was no longer necessary. Mother further asserts reasonable alternative means of protecting A.W. prevented the need to remove her because, without the other siblings, mother could focus her attention on helping A.W., and A.W. could receive other services. We find mother has failed to meet her burden on appeal of showing there was not substantial evidence supporting the juvenile court's removal order.

First, mother's argument ignores that the juvenile court's removal order was based not only on risk caused by A.W.'s inappropriate sexual behavior, but also because there was a substantial danger to A.W.'s "physical health, safety, protection, physical and emotional well-being." (§ 361, subd. (c)(1).) Unchallenged factual findings that mother failed to "adequately and appropriately" supervise the children (including A.J.'s being struck by a car) support this determination. There were also unchallenged findings regarding concerns that mother generally neglected the children and utilized inappropriate corporal punishment against A.W. specifically. The court further found the Agency investigation into these allegations was inconclusive because of mother's failure to cooperate and specific instructions to the children not to speak with the social worker

12

about "discipline." The delivered services log offered into evidence further supported mother's difficulties appropriately supervising her children, mother's use of corporal punishment (including the use of a belt), and mother's noncooperation with the Agency.

Second, mother's argument ignores that A.W. remained at substantial risk of harm because of mother's failure to personally engage and take A.W. to counseling specifically targeted to help with A.W.'s sexualized behaviors regardless of whether she would have access to revictimize Al.W. Failure to address A.W.'s prior sexual abuse and associated sexual acting-out was undeniably harmful to her. (See, e.g., *In re Javier G.* (2006) 137 Cal.App.4th 453, 463 [recognizing harm of withholding appropriate therapy from minor regardless of that minor's potential to abuse other children within the home].) Thus, we find mother has failed to show a lack of substantial evidence supporting the juvenile court's determination that A.W. was at substantial risk of harm if left in mother's care. (*In re D.D., supra*, 32 Cal.App.5th at p. 990.)

Finally, we conclude mother has failed to show a lack of substantial evidence supporting the juvenile court's determination that there were "no reasonable means by which the child's physical health, safety, protection, physical and emotional well-being" could be protected without removing A.W. from mother's custody. (§361, subd. (c)(1).) Mother had received 28 months of services by the time of the juvenile court's order, but still failed to adequately and appropriately supervise her children. Further, as previously noted, mother refused to participate in and take A.W. to counseling with a specialist specifically identified to address A.W.'s sexual abuse and associated sexualized behaviors. Moreover, mother's repeated missing and cancellation of appointments with service providers was endangering A.W.'s critical WRAP services. Finally, mother failed to follow the safety plan, refused to cooperate with Agency investigations of recent hotline referrals, and instructed her children not to speak with the Agency social worker about household discipline. These circumstances amply support the juvenile court's determination.

13

## III.  DISPOSITION

The judgment is affirmed.

/S/

RENNER, Acting P. J.

We concur:

/S/

MESIWALA, J.

/S/

FEINBERG, J.

14